IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| KEVIN CONNORS, | |
| *Plaintiff,* | CIVIL ACTION NO.: 4:17-cv-1512 |
| v. | |
| EDGAR HULIPAS, et al., | |
| *Defendants.* | |

## PLAINTIFF'S CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Kevin Connors ("Mr. Connors") hereby opposes Defendants' Motion for Summary Judgment (Doc. Nos. 98, 100) filed by Texas Dept. of Criminal Justice ("TDCJ") and Dr. Edgar Hulipas, Terry Speer, and the University of Texas Medical Branch ("UTMB"), (collectively, "Defendants"), and ask that the Court deny said motions for the following reasons.

///

///

///

## TABLE OF CONTENTS

**Page**

I.    BACKGROUND ...............................................................................................6

II.   ARGUMENT ....................................................................................................6

      A.    Dr. Julye's Expert Opinion is Inadmissible per Rule 702 ......................6

             1.   The medical records expert reviewed only seven percent of the record...........9

             2.   The expert failed to comply with a duly issued subpoena ................................8

             3.   The expert's opinion is based on insufficient data, a nonspecific method, and cannot assist the trier of fact to evaluate the evidence .............................10

      B.    There is a Genuine Issue of Material Fact as to Whether UTMB Officials are Coercing Mr. Connors to Receive Unnecessary Surgery ................11

      C.    Defendants do not Accommodate Plaintiff's Dietary Needs Resulting in Severe Pain and Repeated Hospitalizations...........................................15

             1.   TDCJ Standard Diet is not "Low-Residue"....................................................15

             2.   The Unavailability of a Low-Residue Diet Puts Mr. Connors at High Risk or Causes Bowel Obstructions, Rectal Bleeding, Severe Abdominal Pain, and other Maladies...............................................20

      D.    Defendants have not consistently provided medical supplies for Mr. Connors ....25

             1.   Defendants punitively reduced Mr. Connors ileostomy supplies in Sept. 2017 ........................................................................................25

             2.   Connors has been routinely denied adequate Osmolite nutritional supplement ............................................................................................27

      E.    Defendants Hulipas and Speer are not Immune.......................................28

      F.    Mr. Connors has stated an ADA and RA claim against UTMB..........................30

             1.   UTMB intentionally discriminated against Mr. Connors ...............................30

             2.   Mr. Connors was excluded from the benefits of services, programs, or activities..................................................................................31

      G.    Defendants fail to address Other Claims of Mr. Connors.......................32

      H.    Defendant TDCJ is vicariously liable through ADA and RA................................33

III.   CONCLUSION...............................................................................................34

INDEX OF EXHIBITS..............................................................................................35

CERTIFICATE OF SERVICE ..................................................................................36

**<u>TABLE OF AUTHORITIES</u>**

**U.S. Constitution** Page

Fourteenth Amendment ............................................................................12,13

Eighth Amendment ................................................................................ *passim*

**Federal Cases** Page

*Ables v. Hall*................................................................................................23
    Civil Action 4:18CV187-JMV (N.D. Miss. December 21, 2018)

*Arnett v. Webster*........................................................................................15
    658 F.3d 742 (7th Cir. 2011)

*Bennett-Nelson v. Louisiana Bd. of Regents* ..............................................30
    431 F.3d 448 (5th Cir. 2005)

*Brewster v. Dretke* ......................................................................................27
    587 F.3d 764 (5th Cir. 2009)

*Conn v. Gabbert*..........................................................................................29
    526 U.S. 286 (1999)

*Cowan v. Scott* ............................................................................................12
    31 Fed.Appx. 832 (5th Cir. 2002)

*Cruzan by Cruzan v. Director, Missouri Department of Health* ................12
    497 U.S. 261 (1990)

*Daugherty v. Luong* ....................................................................................23
    485 F.App'x 696 (5th Cir. 2012)

*Delano-Pyle v. Victoria County Tex.*
    302 F.3d 567 (5th Cir. 2002) ................................................................33

*Easter v. Powell* ..........................................................................................23
    467 F.3d 459 (5th Cir. 2006)

*Evans v. Ball* ..............................................................................................29
    168 F.3d 856 (5th Cir. 1999)

*Farmer v. Brennan*......................................................................................23
    511 U.S. 825 (1994)

*Gobert v. Caldwell*......................................................................................13
    463 F.3d 339 (5th Cir. 2006)

*Gregory v. Baucum* ................................................................................23, 27
    18-10291 (5th Cir. September 20, 2019)

*Hacker v. Cain* ............................................................................................15
    Civil Action 3:14-00063 (M.D. La. June 6, 2016)

*Hare v. City of Corinth, Miss.*....................................................................29
    135 F.3d 320 (5th Cir. 1998)

*Hay v. Thaler* ..................................................................................................23
    470 F.App'x 411 (5th Cir. 2012)

*Hinojosa v. Livingston* .....................................................................................31
    994 F.Supp.2d 840 (S.D. Tex. 2014)

*Jones v. Simek* ..................................................................................................15
    193 F.3d 485 (7th Cir. 1999)

*Jones v. Tex. Dep't of Criminal Justice* ...........................................................23
    880 F.3d 756 (5th Cir. 2018)

*Kerr v. Lyford* ..................................................................................................29
    171 F.3d 330 (5th Cir. 1999)

*Marquez v. Woody* .......................................................................................23, 29
    440 F.App'x. 318 (5th Cir. 2011)

*Martone v. Livingston* ......................................................................................31
    No. 4:13-CV-3369 (S.D. Tex. July 16, 2014)

*McCoy v. Tex. Dept. of Crim. Justice* ..........................................................30, 31
    2006 WL 2331055 (S.D. Tex. 2006)

*O'Neil v. Texas Dept. of Criminal Justice* .......................................................30
    804 F.Supp.2d 532 (N.D. Tex. 2011)

*Paz v. Brush Engineered Materials, Inc.* .........................................................11
    555 F.3d 383 (5th Cir. 2009)

*Plains Capital Bank v. Keller Independent School District*
    16-11802 (5th Cir. August 17, 2018) ..........................................................33

*Ramos v. Lamm* .................................................................................................15
    639 F.2d 559 (10th Cir. 1980)

*Seaman v. Seacor Marine LLC* .........................................................................11
    326 Fed.Appx. 721 (5th Cir. 2009)

*Siegert v. Gilley* ................................................................................................29
    500 U.S. 226 (1991)

*Small v. Warren* ................................................................................................27
    Civ. 15-8886 (D.N.J. October 12, 2018)

*Smith v. Pinchback* ...........................................................................................23
    242 F.App'x 132 (5th Cir. 2007)

*Soledad v. U.S. Dept. of Treasury* ....................................................................30
    304 F.3d 500 (5th Cir. 2002)

*United States v. Georgia* ...................................................................................30
    546 U.S. 151 (2006)

*United States v. Valencia* ..................................................................................11
    600 F.3d 389 (5th Cir. 2010)

*Victoria W. v. Larpenter* ...................................................................................................12
    369 F.3d 475 (5th Cir. 2004)

*Washington v. Harper* ......................................................................................................12
    494 U.S. 210 (1990)

*Watkins v. Telsmith, Inc.* ..................................................................................................11
    121 F.3d 984 (5th Cir. 1997)

## Federal Statutes                                                 Page

28 CFR § 35.130(b)(1) ......................................................................................................33

42 U.S.C. § 12112(b)(5)(A) ..............................................................................................30

42 U.S.C. § 12132 .............................................................................................................32

## Federal Rules                                                  Page

Fed.R.Civ.P. 41(a)(2) ........................................................................................................33

Fed.R.Civ.P. 45(e) ............................................................................................................10

Fed.R.Evid. 702 ................................................................................................................10

# I.    BACKGROUND

Mr. Connors is an inmate in Defendant Texas Dept. of Criminal Justice's custody. While in custody, Mr. Connors was diagnosed with colon cancer and consequently had most of his colon removed. Mr. Connors was then given an ileostomy, which is a stoma (a hole) between his ileum (the junction between small and large intestine at the abdomen's lower-right) and the outside. Mr. Connors attaches an ileostomy bag to the stoma for his liquid digestive waste to flow into. Mr. Connors has been prescribed a low-residue diet and various medical supplies for his intestines and ileostomy to work properly (see, i.e., Defendant UTMB Motion, Exhibit 1 at 10 "Please provide the patient with a low residue diet… Low residue diet should be daily osmolite in addition to his meals…").

Mr. Connors alleges Defendant UTMB by and through its employees has repeatedly failed to provide these items in violation of the Americans with Disabilities Act as Amended and Sec. 504 of the Rehabilitation Act. Defendant TDCJ is vicariously liable through ADA and RA as it directly contracts with UTMB. Mr. Connors further alleges Defendants Hulipas and Speer have injured him through cruel and unusual punishment in violation of the Eighth Amendment, and punitively withheld said supplies from him in violation of the First Amendment.

# II.    ARGUMENT

## A.    Dr. Julye's Expert Opinion is Inadmissible per Rule 702

### 1.    THE MEDICAL RECORDS EXPERT REVIEWED ONLY SEVEN PERCENT OF THE RECORD

Dr. Julye is designated as a "retained" and "non-retained" testifying expert as to the standard of care for physicians in a prison setting, her review of Mr. Connors's medical records, and her opinion of her colleagues' care and treatment of Mr. Connors (Doc. No. 47).

In March 2019, Dr. Julye testified that she reviewed 500-600 pages of Mr. Connors's medical records in preparation for her deposition.

Q      About how long did you take to look at the medical record,
       would you estimate? […] Do you have an estimate how many
       documents you looked at? […] What's your best estimate?

A      Five hundred to 600 pages. It would be completely a guess,
       but.

Exhibit 1, 9:18–10:9.

Q      And so your estimate is that you looked at or between 500
       and 600 pages. Maybe a little more, maybe a little less.
       But an estimate is 500, 600 pages?

A      Yes.

*Id*. 11:12–15.

After Dr. Julye's March deposition, Defendants produced approximately 8,680 pages of

Mr. Connor's medical records[1] that culminated in the scheduling order being modified a total of

three times (Doc. Nos. 76, 78, 80). Defendants' also agreed for Plaintiff to re-depose Dr. Julye to

question her on the untimely produced medical records ("The parties further agree that Plaintiff

can depose Defendants' joint-expert (Dr. Ernestine Julye) using these documents […]" (Doc. No.

80, at 1). Dr. Julye was deposed again in Sept. 2019, where she testified to reviewing only one

additional medical record:

Q      How many records have you reviewed in this case since the
       last deposition?

A      Just that one.

Q      Do you recall the last deposition that you testified that
       you reviewed 500 to 600 medical records?

A      Pages.

Q      Pages?

A      Yeah.

Q      Correct. Do you recall you said 500 to 600 pages?

---

[1] Defendants produced 344 pages in Nov. 2018, then 7,900 pages in April 2019 and 780 pages in May 2019 totaling
9,024 pages. See Unopposed Plaintiff's Motion to Modify Scheduling Order. Doc. No. 78. A few additional pages
were timely supplemented in August and Sept. 2019.

```
A     Yeah.
Q     And do you know how many pages of medical records the
      defendants have produced in this case?
A     No.
```

Exhibit 2, 11:18–12:6.

```
Q     So the only -- just to repeat, the only thing you did to
      prepare for today's deposition was to look at the last
      entry?
[…]
A     He had a clinic appointment at the hospital in Galveston. I
      looked at it.
Q     Okay. And the whole record of that?
A     No, not the whole record of it. I looked at the assessment
      and plan.
Q     Assessment, plan, correct?
A     Uh-huh.
```

*Id*. 15:20–22, 16:6–12.

Dr. Julye has no intention of reviewing any additional records before trial. *Id*. 19:9–23.

Dr. Julye reviewed only 500-600 pages plus one despite her being asked to read the medical record:

```
Q     [W]hat were you asked to do in this case?
A     I was asked to read the medical record and give a -- a
      description of my understanding of, you know, diagnosis,
      interventions, treatment. That -- that was my understanding
      of my role.
Q     Anything else?
A     No.
```

*Id*. 20:4–11.

Dr. Julye had no method relevant to the issues in this case to decide which records to review:

```
Q     How did you determine which records to review?
[…]
A     I click on the entire record, and then I start just tooling
      through it by date. And then sometimes, you can sort it by
      document description. And then you -- you use that, maybe
      you're looking at labs or radiology.
Q     So as you recall, what did you do when you were reviewing
      these records?
A     That's exactly what I did. I just read and took notes.
```

*Id*. 12:19–22, 20:6–14.

2.   <u>THE EXPERT FAILED TO COMPLY WITH A DULY ISSUED SUBPOENA</u>

Additionally, Dr. Julye appeared at her Sept. 5 deposition pursuant to a *Subpoena Duces Tecum Ad Testificandum* that was served nearly a month earlier on Aug. 8, 2019. It included a demand for the production of twenty categories of documents.

```
MR. FRIEDMAN: I'm going to move into evidence Exhibit 7, a
      document titled "Subpoena Duces Tecum Ad Testificandum." I
      have only one copy for counsel of all the documents.
Q     (BY MR. FRIEDMAN) Dr. Julye, are you familiar with this
      document?
A     No.
Q     Have you seen this before?
A     No.
```

*Id*. 16:14–22. See also Exhibit 3 (Subpoena, which is originally filed under Doc. No. 81).

Dr. Julye was not familiar with the subpoena, was not e-mailed the subpoena by her attorneys or did not open the subpoena, and failed to bring any subpoenaed documents. *Id*. 17:3–13. Dr. Julye made no effort to look for subpoenaed documents. *Id*. 18:3–15.

Defendants' attorneys were properly served with the subpoena and moved to quash it (Doc. No. 88). The Court did not rule on Defendants' motion so the subpoena was not quashed and no protective order issued. Nonetheless, Dr. Julye failed to produce any of the twenty-one

categories of documents <u>at any time through the present</u> thwarting a significant part of the examination.

     The day before the deposition, Plaintiff's attorney offered to postpone the deposition in light of the pending motion to quash but Defendants refused.

> I offered yesterday -- I called Ms. Warren, I spoke with
> Mr. Garcia, I offered to postpone today's deposition
> because we have a pending motion to quash and protective
> order. And when I spoke with Mr. Garcia, he declined that
> offer. I also asked to postpone this deposition so I could
> review new production of documents with my client, and that
> was also turned down.

*Id.* 5:1–7.

     Dr. Julye's attorneys knew she was subpoenaed to bring several documents, her attorneys knew that Court did not rule on their motion to quash, yet nonetheless Dr. Julye produced no subpoenaed documents. Plaintiff was unable to depose Dr. Julye on the subpoenaed documents nor have Defendants ever produced them. This prejudices Plaintiff and violates Fed.R.Civ.P. 45(e) ("A person responding to a subpoena to produce documents must produce them […]").

3. <u>THE EXPERT'S OPINION IS BASED ON INSUFFICIENT DATA, A NONSPECIFIC METHOD, AND CANNOT ASSIST THE TRIER OF FACT TO EVALUATE THE EVIDENCE</u>

     Fed.R.Evid. 702 requires that experts be able to assist the trier of fact to understand the evidence, be based on sufficient facts or data, be the product of reliable principles and methods. Given that Dr. Julye testified that she reviewed only seven percent of Mr. Connors medical records[2] and only the assessment of the most recent medical records from Hospital Galveston, and she just "tooled" through the records by date, all despite being Defendants' expert on these records, Dr. Julye's comprehension of Mr. Connors's medical records is little more than basic.

---

[2] 600 pages reviewed ÷ 9,024 pages produced = 7%

She has no methodology beyond tooling. Consequently, Dr. Julye cannot help the trier of fact to understand the evidence.

"[W]hen expert testimony is offered, the trial judge must perform a screening function to ensure that the expert's opinion is reliable and relevant to the facts at issue in the case." *Watkins v. Telsmith, Inc*., 121 F.3d 984, 988–89 (5th Cir. 1997). Expert testimony must be supported by "more than subjective belief or unsupported speculation." *Paz v. Brush Engineered Materials, Inc*., 555 F.3d 383, 388 (5th Cir. 2009). It "must be reliable at each and every step or it is inadmissible. The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Seaman v. Seacor Marine LLC*, 326 Fed.Appx. 721, 725 (5th Cir. 2009). "Overall, the trial court must strive to ensure that the expert, whether basing testimony on professional studies or personal experience, employs in the courthouse the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010). Simply put, a nonspecific methodology covering seven percent of 9,024 records and only the assessment plan of the most recent medical record is not intellectual rigor. Her testimony is inadmissible, including but not limited to UTMB's Motion, Exhibit 3, Affidavit of Dr. Julye, and Exhibit 5, Deposition of Dr. Julye.

Mr. Connors nonetheless cites some of Dr. Julye's testimony to the extent that it demonstrates genuine issues of material facts and does not waive his objection to the admissibility of Dr. Julye's other testimony.

## B.   There is a Genuine Issue of Material Fact as to Whether UTMB Officials are Coercing Mr. Connors to Receive Unnecessary Surgery

Defendants argue that Mr. Connors has been given the option to reverse his ileostomy that he adamantly refused; therefore, Defendants are not deliberately indifferent in violation of

the Eighth Amendment when they deprived Mr. Connors of other medical supplies and treatment recommended for his condition. "Dr. Guturu explained that the treatment of choice for diversion colitis is reversal of Mr. Connors' loop ileostomy; however, Mr. Connors is adamant he does not want his ileostomy reversed." UTMB Motion at 3, 6–7.

Defendants provide no evidence that the ileostomy reversal is medically necessary, therefore it is an elective surgery. *Victoria W. v. Larpenter*, 369 F.3d 475, 479 (5th Cir. 2004) (non-necessary medical procedures such as abortions are elective). In fact, Dr. Guturu calls the reversal the "treatment of choice" with the word "choice" to mean that it is not necessary. In either case, Mr. Connors has a protected liberty interest to refuse medical treatment. *Cruzan by Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 278 (1990). Defendants have submitted no evidence that the ileostomy reversal is guaranteed to succeed or that Mr. Connors is guaranteed to wake up from surgery, both important factors to be weighed when considering elective surgery.

Defendants have no grounds to insist that Mr. Connors submit to surgery nor to punish him if he refuses. Defendants evidently know they cannot force Mr. Connors to suffer through another surgery they have not attempted to force Mr. Connors to do so through legal process. See *Cowan v. Scott*, 31 Fed.Appx. 832, *4 (5th Cir. 2002), citing *Washington v. Harper*, 494 U.S. 210, 221-22 (1990) (holding that it violates an inmate's Fourteenth Amendment rights to force medical treatment unless it's in the prison's best medical interest and the inmate is a danger to himself or others).

Whereby, Mr. Connors has at least two options: (1) submit to surgery that has no guarantee of success and that he may not wake up from, or (2) continue to receive a suitable diet and supplies prescribed to him by specialists. See, e.g., UTMB Motion, Exhibit 1 at 10 "Please provide the patient with a low residue diet…".

Here, Defendants characterize Mr. Connors's refusal of surgery as mere disagreement with medical treatment, then argue that disagreement does not meet the deliberate indifference standard (Motion, at 4) citing *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (holding "Unsuccessful medical treatment, acts of negligence or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances.") *Gobert* granted qualified immunity to a prison physician who allegedly failed to properly treat an infected leg. This is distinguished from the instant case because the plaintiff in *Gobert* disagreed with the treatment that he actually received while Mr. Connors agrees with the treatment that he is trying to receive and was prescribed by several UTMB specialists. Mr. Connors does not disagree with alternative treatment, the surgery, he refuses it per his constitutional right. *Gobert* makes no holding on deliberate indifference when an inmate seeks to enforce treatment that he agrees with but a defendant refuses to honor.

Defendants attempt to argue without authority that since Mr. Connors has not waived his Fourteenth Amendment right to refuse elective medical treatment, they are somehow relieved of their own constitutional duty to treat Mr. Connors's medical conditions through other medically sound means that Plaintiff and Defendants' medical specialists have agreed that he needs. Defendants' message to Mr. Connors is reasonably interpreted as "we will not provide you with your prescribed diet and medical supplies so you might as well submit to surgery." **Depriving Mr. Connors of his medically necessary diet and supplies unless he submits to surgery is coercive.** This same argument in the reciprocal is just as absurd—had Mr. Connors chosen surgery and that surgery was performed with alleged deliberate indifference, Defendants could not defend themselves by saying that Mr. Connors should have chosen the diet and supplies. But that's what Defendants now argue as their defense and only speculate that surgery would be effective.

Defendants have supplied numerous medical records evidencing deficiency and ample disagreement between the parties regarding the adequacy of Mr. Connors receiving his prescribed diet and medical supplies.

Perhaps most dramatically, Mr. Connors was prescribed osmolite three times daily from Sept. 13-Oct. 13, 2016. UTMB Motion, Exhibit 1, at 89. However, on Feb. 21, 2017, Investigator Carly Parkinson stated, "[Mr. Connors] has not had a pass to go to the clinic three times daily for his osmolite since 07/10/2014. Per my nurse consultation, this nutritional supplement is a direct observation therapy medication." *Id*. at 94. **The investigator found that for nearly three years, including for the Sept. 2016 prescription, Mr. Connors was denied access to three cans daily that was deemed a "therapy medication" for him.**

Other genuine disputes of material facts are found throughout UTMB's Exhibit 1 alone, several of which appeared in Plaintiff's Motion for Partial Summary Judgment (Doc. No. 97) now pending. See for example Mr. Connors's grievance and investigation against Defendant Speer for delaying prescribed diet (UTMB Motion, Exhibit 1, at 1–9); grievance that Defendant Speer "stopped his osmolite supplement by instructing nurses at the pill window to stop issuing them." (*id*. at 33); grievance that he has not been receiving prescribed osmolite contrary to Defendants' claims that he has (*id*. at 73–74); grievance that he has not been receiving prescribed osmolite while in prison lockdown (*id*. at 78); grievance against Defendant Hulipas of failing to provide prescribed ileostomy supplies leaving him unable to adequately care for himself and stay sanitary (*id*. at 53–72); grievance against Defendant Hulipas for failing to renew osmolite prescription contrary to Dr. Lannette Linthicum's instructions (*id*. at 97–107); UTMB nurse failed to honor prescription because she allegedly said that she had no time for it (*id*. at 108).

Mr. Connors suffers on a diet other than low-residue because "the non-fluid digestive waste passes by the abdominal holes … obstruct[s] portions of my colon [and] I suffer unbearable pain and I must be hospitalized." Exhibit 4, ¶ 6. "My colon has been blocked

approximately twelve times because of inappropriate food given to me by TDCJ staff that required my hospitalization. When this happens, the pain is so severe that I think about killing myself to be free of the pain." Exhibit 5, ¶ 7.

Other courts have held that prison officials who refuse to fulfill medical prescriptions may be deliberately indifferent or at least a reasonable jury could conclude such that precludes summary judgment. "Deliberate indifference to serious medical needs is shown when prison officials have prevented an inmate from receiving recommended treatment," *Hacker v. Cain*, Civil Action 3:14-00063 (M.D. La. June 6, 2016) (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)). See also *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) (allegation that medical official refused to provide inmate with prescribed anti-inflammatory medication or substitute, despite his repeated complaints and worsening pain, stated claim for deliberate indifference); *Jones v. Simek*, 193 F.3d 485, 490-91 (7th Cir. 1999) (evidence prison doctor refused to follow specialist's orders precluded summary judgment).

Given the repeated failures of Defendants of fulfilling Mr. Connors's "recommended treatment" and Mr. Connors "repeated complaints and worsening pain" evidenced in his grievances and affidavits by not receiving them, summary judgment is precluded.

## C. Defendants do not Accommodate Plaintiff's Dietary Needs Resulting in Severe Pain and Repeated Hospitalizations

### 1. TDCJ STANDARD DIET IS NOT "LOW-RESIDUE"

There is a genuine issue of material fact regarding whether the TDCJ standard prison diet is a low-residue diet and whether Mr. Connors is being properly counseled on which foods he can and cannot eat.

Defendants argue that "Connors' oncology specialist recommended he receive a 'low-residue diet, which means a diet that is low in fiber and easy to digest.' TDCJ does not have a

diet specifically labeled as 'low residue.'" Motion at 6. Defendants further explain Dr. Julye's and Defendant Hulipas's position that "The prison diet can accommodate this as much of the starches are made from refined white flour, vegetables are undercooked and mush, with not much fiber in them, and nuts and seeds are only sold in commissary."

Thereby, Defendants present a unified opinion among oncology, Dr. Julye, and Defendant Hulipas to tell the Court that Mr. Connors is appropriately fed on the standard prison diet so long as he picks and chooses appropriate foods.

To be clear however, the standard prison diet is not low-residue. The complete context of the oncologist's request follows:

> "Patient is overweight and on a **regular diet**. Oncology is recommending a **low-residue diet**, which means a diet that is low in fiber and easy to digest. It recommends avoiding whole grain foods, nuts, seeds, raw, or dried fruit, and vegetables. The prison diet can accommodate this as much of the starches are made from refined white flour, vegetables are undercooked and mushy, with not much fiber in them and nuts and seeds are only sold in commissary." (Emphasis added.)

UTMB Motion, Exhibit 3 at 2.

Clearly, oncology was alarmed that Mr. Connors was on a regular prison diet that prompted the recommendation. Oncology said he should be on the low-residue diet, so the two diets are not equivalent and Mr. Connors should not be on the regular diet.

Oncology apparently believed that the regular diet could have food items removed to comply with the low-residue diet. See also "kitchen reports that specific **low residue diet is not available**. The best they can offer is a **pureed diet**, OTW o/p will need to pick low residue foods from regular diet line." Exhibit 6, Bates 3180 (emphasis added).

Inexplicably, in 2015, Mr. Connors was counseled by UTMB Ashok Kuchukulla, a registered dietician, to "limit fried foods [and] **eat more fiber food** such as legumes, vegetables" (emphasis added). Exhibit 6, Bates 580. Whereby UTMB's dietician is specifically telling Mr.

Connors to eat food that he must not eat and is relying on him to pick and choose food "from regular diet line" that will again obstruct his bowels and send him to the hospital as oncology recommended against. Mr. Connors has been even been denied the opportunity to pick and choose food at those times when the prison is in lockdown or when he is in administrative segregation as admitted by Defendants' counsel in open court on Dec. 6, 2019.

Consistent with Kuchukulla's opinion, Dr. Julye's opinion is that Mr. Connors should be on a low-fiber diet only in the acute phase of disease, "I think if you want to advocate for this patient's health, you do the low fiber for the first six weeks post-op or maybe even a -- any acute phase. You know, Doc, I have massive diarrhea this week. Well, cut out the fiber this week, any acute phase." Exhibit 2, 79:21–25. After the acute phase, Dr. Julye says Mr. Connors should return to a high fiber diet, for example, to reduce his risk of colon cancer, "[I]f I were to encourage him to reduce his risk for colon cancer in the future, my personal opinion is, yeah, eat some oatmeal, eat some more fiber[.]" *Id*. 79:15–17. Dr. Julye clarified that Mr. Connors should not generally be on a low-residue diet:

> Q    And you –– and you can think of no reason for a long-term,
>      low-residue diet, low-fiber diet for Mr. Connors?
> A    I mean, if you really want to advocate for somebody's
>      health, you don't tell anybody to stick to a low-fiber
>      diet. You want –– you want them to –– you may not say high
>      fiber, but you might say, you know, a well-rounded, healthy
>      diet. I think the question is, can I think of any reason to
>      give a person ––
> Q    To give Mr. Connors.
> A    –– a low-fiber diet believing that that's going to have
>      impact for good health? I think most physicians would agree
>      that a low-fiber diet is not in the interest of general
>      good health. Are you helping him short term with some
>      symptoms? Perhaps.

*Id*. 102:8–22.

In total, Dr. Julye doesn't know whether Mr. Connors should be eating high fiber foods

or not:

```
Q    How about whole kernel corn, is that part of the dialysis
     diet?
A    I don't know. I'd have to ask the dialysis dietitian down
     the hall.
Q    Should it be served to Mr. Connors?
A    I don't know.
Q    Is it high fiber?
A    Corn is useless. We shouldn't -- we should -- none of us
     should eat corn. No, I don't think Mr. Connors should eat
     corn. Let's not eat corn. Let's not any of us eat corn.
Q    Is it high fiber?
A    Yes, it would be fiber.
```

*Id*. 81:8–20.

Immediately after this exchange, Defendants' counsel interrupted Plaintiff's deposition

for an unscheduled break:

```
MS. WARREN: Let's go ahead and take a break.
MR. FRIEDMAN: I'm not ready for a break.
MR. GARCIA: I am. We can take one whenever we want.
MR. FRIEDMAN: This is my deposition, Counsel.
MR. GARCIA: There's not a question on the table. There's not a
     question on the table. We can take a break.
MR. FRIEDMAN: This is my deposition, Counsel.
MR. GARCIA: It is, and we can take a break at any time.
MR. FRIEDMAN: At an appropriate time.
MR. GARCIA: This is appropriate. We've been going an hour and
     half. I would like to take a break.
MR. FRIEDMAN: You can request a break.
MR. GARCIA: We're taking a break.
MR. FRIEDMAN: Let the record reflect I have not agreed to having
     a break.
```

```
MR. GARCIA: Okay. Note that it's not agreed.
THE WITNESS: Yeah, I need some water.
MR. FRIEDMAN: Defendant attorneys are walking out of the room as
     is the witness.
```

*Id.*, 81:21–82:17.

Apparently, Defendants wanted to coach Dr. Julye while she was being questioned on the

foods that Mr. Connors should or should not eat.

Dr. Julye has never seen an order advising to change Mr. Connors diet to regular nor have

any disclosed records indicated such.

```
Q    Have you seen any order at any time from any health care
     provider telling him not to be on the low-residue diet?
A    No.
```

*Id.* 167:9–12.

Plaintiff's medical expert, Dr. Jerry Vlasak, opined in his expert report that "A low-

residue diet, that is a diet low in roughage, is normally prescribed for patients with an ileostomy.

Foods high in roughage, and to be avoided, include whole grains, raw vegetables and fruit."

Exhibit 7, at 5. "As the evidence I reviewed shows, Mr. Connors was routinely and repeatedly

denied the prescribed low-residue diet and nutritional supplements needed to maintain his

nutrition and prevent complications from aberrant ileostomy leakage." *Id.* at 6. "By July 12, 2017

Mr. Connors was in such abdominal pain that he was taken to the hospital Emergency

Department, where again the low-residue diet and supplements were re-ordered." *Id.* at 7. "*It*

*should be noted that a dialysis diet is one purposely high in protein and not necessarily a low-*

*residue diet, and therefore not appropriate for the condition afflicting plaintiff.*" *Id.* (emphasis in

the original).

2. THE UNAVAILABILITY OF A LOW-RESIDUE DIET PUTS MR. CONNORS AT HIGH RISK OR CAUSES BOWEL OBSTRUCTIONS, RECTAL BLEEDING, SEVERE ABDOMINAL PAIN, AND OTHER MALADIES

Defendants generally rely on Mr. Connors to pick those foods out of the regular diet line depending on who is counseling him on his diet. This is ineffective for Mr. Connors who has repeatedly complained by grievance and through the instant lawsuit that he is not provided with suitable foods and has been repeatedly hospitalized because of it.

"I must eat a 'low residue diet' for my digestive waste to remain fluid and enter the ileostomy bag without harmful consequences. For example, I must not eat corn, beans, greens, or even greasy foods. If I eat any more than a trace amount of fiber or greasy foods, my digestive waste gets bulky and does not enter the ileostomy bag correctly. When this happens, the non-fluid digestive waste passes by the abdominal holes, does not drain into the ileostomy bag, and will obstruct portions of my colon. When my colon is blocked, I suffer unbearable pain and I must be hospitalized, and some digestive waste will drain out of my anus uncontrollably.

"However, many times since my surgery, TDCJ medical staff has not ordered, has refused to order, and has refused to give me [nutritional] formula even when it is in stock. When I am denied the formula, I have no choice but to eat inappropriate food for adequate nutrition and to survive. I risk a painful or life-threatening bowel obstruction when I eat the wrong diet.

"My colon has been blocked approximately twelve times because of inappropriate food given to me by TDCJ. When this happens, I experience pain so severe that I think about killing myself to be free of the pain. My abdomen will swell and distend. I will sweat profusely, I'll be dizzy, and I am beyond miserable. On multiple occasions after being forced to eat inappropriate foods, I have had blood, pus, and other fluids come out of my anus, and my scrotum has filled with unknown fluids. On these occasions, I am sent to the hospital for treatment including surgery.

"On one occasion, digestive waste that did not drain into the ileostomy bag formed into a ball and blocked my colon. This ball turned into an abscess. The abscess threatened my life. I had surgery to have it removed that involved drilling a hole into my buttocks. Because of the urgency of my condition, a nurse had to lubricate his hand to manually dig some of the obstruction out of bowels before surgery. The ball would not have formed, the abscess would not have resulted, and the surgery would not

have been necessary if I had a regular and adequate supply of formula and appropriate low-residue diet."

Exhibit 4, ¶ 6–9.

Mr. Connors had his colon cancer procedures in 2011 and has since accumulated around 9,024 pages of medical records, presently averaging around 1000 pages annually. Many of these records relate to hospitalizations relate to intestinal pain, rectal bleeding, and other severe symptoms that UTMB specialists all insist require Mr. Connors to be on a low-residue diet.

Q    Okay. Further down the page, history of present illness, halfway through the first paragraph, it says: "Was prescribed residue diet -- low-residue diet with BOOST or Osmolite supplement." Can you read that?

A    "Was prescribed low-residue diet with BOOST or Osmolite supplementation to further prevent rectal obstruction and abscess creation."

Q    What does that mean to you?

A    It doesn't mean a lot to me.

Q    What does it mean?

A    Well, the -- the physician is saying, low-residue diet with BOOST or Osmolite supplementation to prevent rectal obstruction and abscess creation.

Q    Can you go farther back to page -- to Bates Number 850? In the top section of the page, where it says "have CT," at that bottom item, it says: "GI low-residue diet with Osmolite supplementation." What does that section mean to you? Is that a -- a plan, or what do all those items mean?

A    So he finished his note, and then he writes an addendum. It says "Resident Addendum," and he writes --

Q    Above -- above the resident addendum. I'm talking at the top of the page.

A    Oh. Well, he writes it in his addendum too: "GI low-residue diet with Osmolite supplementation." "GI low-residue diet with Osmolite supplementation." It's written in both places.

```
Q      Okay. So the resident, he's recommending it? He's ordering
       it?
A      Yeah, the patient's in the hospital with acute
       presentation. He's ordering a low-fiber diet.
Q      Under the -- under the addendum for rectal discharge, the
       resident writes: "Also, patient was not on a low-residue
       diet." Why -- why would a resident write that?
A      It sounds like there's no low-residue diet order. We had to
       explain it back in May what a low-residue diet is.
Q      Does it make sense -- this is how I interpret it, tell me
       if this is what -- how you interpret it: That he wasn't on
       a low-residue diet, he's having these issues now, the
       rectal blood and pus, and so now the resident is saying put
       him on a low-residue diet? Is that --
A      I feel that this resident thinks that a low-residue diet
       would be impactful[.]
```

Exhibit 2, 129:5–130:24.

UTMB specialists have repeatedly recommended that Mr. Connors be placed on a low-residue diet, each time after a so-called acute event, which is evidence that he has not been:

```
Q      How many times have various doctors requested that Mr.
       Connors be on a low-residue diet?
A      I don't know. How many times? I have no idea.
Q      How many times do you recall at this deposition?
A      Many times, and I've seen it ordered many times in this
       deposition throughout these notes.
```

*Id.* 158:21–159:1.

Defendant Hulipas testified that he understands Mr. Connors is at risk of a bowel obstruction when he is not on a low-residue diet.

```
Q      What does "residue" mean, if not fiber?
A      That's a -- when you say "low-residue," you minimize the
       fiber amount, because the goal is for you to have, like, a
```

```
            manageable stool in his case so he will not obstruct --
            obstructed rather.
Q           So what are the risks of Mr. Connors not being on a low-
            fiber or a low-residue diet? You said that there's a chance
            that he'll obstruct; is that correct?
A           That's my understanding in general.
```

Exhibit 8, 46:21–47:5.

Under the Eighth Amendment, prison officials have a duty to "ensure that inmates receive adequate … medical care." *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Refusal to provide a diet ordered by a doctor that results in harm states an Eighth Amendment claim. See, e.g., *Jones v. Tex. Dep't of Criminal Justice*, 880 F.3d 756, 758, 760 (5th Cir. 2018) (per curiam) (prisoner stated a viable claim where he was denied a diabetic diet ordered by his doctor, which allegedly resulted in a heart attack and other life-threatening complications); and an insulin-dependent diabetic who receives the standard prison diet that caused "problems with vision and numbness and pain in his lower extremities" states a claim. *Ables v. Hall*, Civil Action 4:18CV187-JMV, (N.D. Miss. December 21, 2018) (citing *Farmer*, 511 U.S. at 839 (holding officials violate Eighth Amendment by a knowing disregard of an excessive risk to inmate health or safety)). An inadequate diet that results in limited food choice can state an Eighth Amendment claim such as inmates who can subsist on a soft food diet in lieu of dentures but are denied both. *Gregory v. Baucum*, 18-10291, (5th Cir. September 20, 2019) (citing unpublished *Daugherty v. Luong*, 485 F.App'x 696, 696-97 (5th Cir. 2012); *Hay v. Thaler*, 470 F.App'x 411, 415 (5th Cir. 2012); *Marquez v. Woody*, 440 F.App'x 318, 319, 323 (5th Cir. 2011); *Smith v. Pinchback*, 242 F.App'x 132, 133 (5th Cir. 2007). As explained by Dr. Vlasak and several UTMB specialists who have treated Mr. Connors, without his low-residue diet, he is vulnerable to and suffered "such abdominal pain that he was

taken to the hospital Emergency Department, where again the low-residue diet and supplements were re-ordered." Exhibit 7, at 7.

There is no question that Mr. Connors should be on a low-residue diet. Picking and choosing foods has been ineffective. They result in multiple hospitalizations followed by repeated orders by UTMB specialists for prison staff to get him on a low-residue diet.

UTMB specialists advise that Mr. Connors be on the low-residue diet as does Plaintiff's expert. Defendant Hulipas testified that he knows Mr. Connors is susceptible to a bowel obstruction if he is not on the low-residue diet. Yet Defendants' expert, who has read seven percent of Mr. Connors's medical records claim that at most, opines that the low-residue diet is only appropriate for the acute phase of disease although she has seen many doctor recommendations for the diet and never seen an order to end the diet.

Mr. Connors is inconsistently counseled by UTMB on what to eat, Defendant's expert doesn't know what he should be eating, and all along Mr. Connors has been hospitalized around twelve times and had around five major medical procedures as a result of receiving an improper diet. At the very least, there are genuine issues of material fact as to whether Mr. Connors needs the reasonable accommodation of a low-residue diet and whether Defendants were deliberately indifferent to his health and safety not to provide it.

Further, given that failure to provide Mr. Connors with a medically necessary diet constitutes a cruel and unusual punishment claim and Defendants offer therapeutic diets for a variety of medical conditions, it is a reasonable accommodation for UTMB to design a nutritionally adequate low-residue diet and keep Mr. Connors on that diet in compliance with the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

**D.      Defendants have not consistently provided medical supplies for Mr. Connors**

1.   DEFENDANTS PUNITIVELY REDUCED MR. CONNORS ILEOSTOMY SUPPLIES IN SEPT. 2017

Defendants assert that they have "consistently prescribed, and Connors constantly

received the necessary amount of supplies required to maintain and sanitize his ileostomy bag."

Motion at 7. Mr. Connors needs more supplies than simply to "maintain and sanitize his

ileostomy bag." Other supplies needed include:

```
Q    What supplies?
A    9/22/16, medical pass quoted as follows: Please allow this
     patient to have the following supplies for one year per Dr.
     Hulipas. Gauze, wafers, bag, paper tapes, trash bags, skin
     prep, adhesive remover, tube adhesive, adhesive filler,
     weekly condom cath, connecters, urine light bag, extension
     tube. […]
```

Exhibit 1, 53:20–54:1.

There is a genuine issue of material fact whether Mr. Connors has been receiving his

supplies over the time period relevant to suit. He complains,

> "TDCJ medical staff frequently does not give me an adequate supply of
> gauze to clean my stoma (the abdominal holes) around my ileostomy bag.
> As a result, I am forced to use toilet paper instead. […] I have been
> instructed by medical specialists not to use toilet paper to clean the stoma.

> "TDCJ medical staff frequently does not give me a supply of containment
> bags. I seal my used ileostomy bags in a containment bag for proper
> biohazard disposal. The containment bags also prevent the offensive
> digestive waste smell from affecting me and others.

Exhibit 4, ¶ 17–18.

Mr. Connors has complained in grievances and in suit that he is deprived of medical

supplies not related to his ileostomy:

> "As a separate matter, my bladder was unintentionally damaged during my
> colo-rectal surgery. As a result, I am unable to control urination. I need a
> regular supply of Detrol LA, a pharmaceutical drug, that treats what is in

effect an over-active bladder. TDCJ medical staff frequently stops my supply of Detrol LA. […]

"Related to my damaged bladder, I have a second bag called a "uro-bag" attached to my body for daytime use. The bag is attached to me through a penis catheter and tube, and the bag is strapped to my leg. TDCJ medical staff presently gives me a short tube that requires the bag to be strapped to my inner thigh, and this makes it difficult to walk. I have frequently requested a long tube so that the bag can be attached to my lower leg and not interfere with walking, but TDCJ medical staff routinely refuses to give me a longer tube. As a result, it is difficult to walk with a bag full of urine strapped to my upper leg.

"As a separate matter, I also suffer from acid reflux. TDCJ medical staff presently and frequently refuses to provide me with acid reflux medication. As a result, I suffer burning pain and discomfort in my throat and stomach areas when I eat and for hours after.

"I am unable to get formula and other medical supplies from any source except through TDCJ medical staff. […]"

Exhibit 4, ¶ 19, 21–23.

Further, Mr. Connors's Motion for Partial Summary Judgment (Doc. No. 97) explains at length how leading up to Sept. 2016, Mr. Connors was receiving twenty ileostomy wafers monthly but Defendants Hulipas and Speer in concert or through conspiracy reduced his supply to nine to retaliate against Mr. Connors for threatening to file a grievance. "Clerk Johnson summoned Defendant Speers who arrived and said that if Mr. Connors was threatening to write a grievance, then he would get all of his supplies reduced." *Id*. at 10. Several supplies were ordered reduced by Defendant Hulipas for no medical reason:

"On or about Sept. 21, 2016, Mr. Connors learned that his medical supply order was going to be reduced by Dr. Hulipas for the next twelve months. The reduced supplies included: (a) 20 wafers reduced to 9, (b) 20 ileostomy bags reduced to 9, (c) 20 trash bags reduced to 10, (d) 16 skin preps reduced to 9, (e) 400 gauze pads reduced to 10, (f) 6 leg urine bags reduced to 5."

*Id*. at 10.

Defendant Hulipas's order was reversed and Mr. Connors's supply was restored the next month. *Id*. at 12.

The Court should note that Mr. Connors's affidavit where he complains about staff frequently not giving him adequate ileostomy supplies is dated May 12, 2017, which is several months after and consistent with the Sept. 2016 incident above. See also Mr. Connors's complaints of not receiving adequate supplies, e.g., UTMB Motion, Exhibit 2, at 134 ("Brought ileostomy/uro supplies yesterday but did not give me 4x4s nor trash bags to dispose of old wafer/bag properly.")

Mr. Connors has accumulated documentary facts evidencing that his necessary medical supplies were reduced. As argued in his motion for partial summary judgment, an inmate whose daily supply of nine diapers was reduced to six without medical reason stated a claim. "In *Small v. Warren*, Civ. 15-8886 (D.N.J. October 12, 2018), a paraplegic inmate was granted an injunction when the prison reduced his daily supply of nine diapers to six and reduced other hygienic supplies without producing evidence that the inmate's needs had changed or that the inmate was misusing the hygienic supplies. 'The Court therefore concludes that Plaintiff's requests for these supplies is reasonable, and that provision of these supplies is necessary to maintain basic sanitary conditions.'" *Id*., at 26. There is no material difference between being denied ileostomy supplies and diapers for inmates who have no control over their waste. There is at least a genuine dispute of material facts on this point. "Courts in this circuit and others have found Eighth Amendment violations when prison officials deprive an inmate of a needed medical prosthesis or other device." *Gregory v. Baucum*, 18-10291 (5th Cir. September 20, 2019) (citing *Brewster v. Dretke*, 587 F.3d 764, 769 (5th Cir. 2009)).

2. CONNORS HAS BEEN ROUTINELY DENIED ADEQUATE OSMOLITE NUTRITIONAL SUPPLEMENT
    Defendants argue that Mr. Connors has been receiving an "adequate amount" of osmolite—a nutritional supplement consistently prescribed to Mr. Connors by UTMB specialists.

Motion at 7. Despite these assertions, UTMB's internal investigation showed that he was denied a medical pass for his three daily osmolite doses over a span of nearly three years—between July 10, 2014 and Feb. 21, 2017. Further, the investigator found that while osmolite is generally a nutritional supplement as Defendants typically refer to it, for Mr. Connors it's a therapeutic prescription. See UTMB Motion, Exhibit 1, at 94.

The investigator's finding is consistent with Mr. Connors's allegations:

"My supply of formula has been stopped after TDCJ medical staff learned that I hired an attorney. It is my present, sincere belief that my supply is presently stopped for this reason.

"On other occasions, my supply of formula is stopped to punish me for speaking up for myself or for no reason that I know of. My other needed medical supplies listed below are also stopped to punish me or for no known reason.

"Dr. Hulipas and Nurse Terry Speer have been ordered by medical specialists at least three times that I know about to give me a regular supply of formula.

"I am allowed a stock of cans of soda in my living space. I am not allowed to have a stock of cans of formula in my living space.

"I need eight ounces of formula three times daily to be safe."

Exhibit 4, ¶¶ 12–16.

There is a genuine dispute of material fact as to Mr. Connors consistently and appropriately receiving his medically necessary osmolite.

### E.   Defendants Hulipas and Speer are not Immune

Defendants argue "Dr. Hulipas and R.N. Speer are entitled to qualified immunity to the extent that Connors is suing them in their individual capacities [and] are presumptively entitled to qualified immunity, and it is Connors' burden to overcome this presumption." Motion at 9.

In deciding a motion for summary judgment that raises the defense of qualified immunity, the court must first decide "whether the plaintiff has alleged the deprivation of an

actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Conn v. Gabbert*, 526 U.S. 286, 290, (1999), citing *Siegert v. Gilley*, 500 U.S. 226, 232-33 (1991); see also *Kerr v. Lyford*, 171 F.3d 330, 339 (5th Cir. 1999). The second prong of the test requires the court to make two separate inquiries: whether the right allegedly violated was clearly established at the time of the event giving rise to the plaintiff's claim, and if so, whether the conduct of the defendant was objectively unreasonable. *Evans v. Ball*, 168 F.3d 856, 860 (5th Cir. 1999); *Hare v. City of Corinth, Miss.*, 135 F.3d 320, 326 (5th Cir. 1998).

As argued *supra*, a wrongful diet that results in physical injury states an Eighth Amendment claim as does depriving an inmate of medical supplies. Further, "It is clearly established that state prisoners are entitled to reasonably adequate food. The Eighth Amendment is violated if the denial of food constitutes a denial of the minimal civilized measure of life's necessities. Indeed, we have held that because depriving a prisoner of adequate food is a form of corporal punishment, the Eighth Amendment imposes limits on prison officials' power to so deprive a prisoner." *Marquez v. Woody*, 440 F.App'x. 318 (5th Cir. 2011) (internal citations and quotation marks omitted).

Defendants' actions were objectively unreasonable. Mr. Connors has been given repeated dietary prescriptions for the low-residue diet (UTMB Motion, Exhibit 2, at 31, 33, 76, 110, 125) without there ever being an order for him to end that diet. Exhibit 2, 167:9–12. He has received these orders after times he suffered severe abdominal pain, bloody stools, bowel obstructions, and was hospitalized approximately twelve times as a result. Exhibit 4, ¶ 8. UTMB specialists have ordered that Mr. Connors receive the low-residue diet and osmolite so that his intestines "work properly," (Exhibit 6, Bates 194) the implication that they will not otherwise work properly and he'll need to be hospitalized again. He has been denied the medically necessary diet and ileostomy supplies by Defendants who knew since his original 2011 colon surgery about his

medical condition and prescriptions as his primary care providers, his pain and hospitalizations by attempting to resolve these deficiencies informally, through filing of grievances, and now through filing suit.

### F.     Mr. Connors has stated an ADA and RA claim against UTMB

1.   UTMB INTENTIONALLY DISCRIMINATED AGAINST MR. CONNORS

Defendants argue, "Connors' ADA claim should be dismissed where neither UTMB nor any of its employees intentionally discriminated against Connors." Motion, at 12. Respective of his claim pursuant to Sec. 504 of the Rehabilitation Act, Defendants argue, "Connors' allegations do not meet the standard required to prove intentional discrimination based solely on his disability." *Id*. at 16.

"The discrimination prohibited by both statutes includes the failure to make reasonable accommodations for a disability." *O'Neil v. Texas Dept. of Criminal Justice*, 804 F.Supp.2d 532 (N.D. Tex. 2011) (citing *McCoy v. Tex. Dept. of Crim. Justice*, 2006 WL 2331055 (S.D.Tex.2006)); 42 U.S.C. § 12112(b)(5)(A). The causation requirements for the ADA and the RA differ in that the ADA proscribes discrimination by reason of disability, whereas the RA premises liability only on discrimination that was solely by reason of a person's disability. See *Soledad v. U.S. Dept. of Treasury*, 304 F.3d 500 (5th Cir. 2002); *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448 (5th Cir. 2005).

In the prison context, failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners. See *United States v. Georgia*, 546 U.S. 151 (2006) (allegations, if true, that defendant refused to provide reasonable accommodations to a paraplegic inmate, "in such fundamentals as mobility, hygiene, medical care," resulted in the disabled inmate suffering

serious punishment "without penal justification"); *McCoy v. Texas Dep't of Criminal Justice*, No. C.A.C 05 370, 2006 WL 2331055, at *7-8 (S.D. Tex. Aug. 9, 2006) (denying summary judgment for TDCJ where TDCJ was on notice of plaintiff's disability, the need for accommodation was obvious, and the failure to accommodate caused plaintiff to suffer a fatal asthma attack); *Martone v. Livingston*, No. 4:13-CV-3369, 2014 WL 3534696, at *16 (S.D. Tex. July 16, 2014); *Hinojosa v. Livingston*, 994 F.Supp.2d 840, 843 (S.D. Tex. 2014).

There is no dispute that Mr. Connors is disabled under the terms of the ADA or RA.

Plaintiff has cited, *supra*, that he has been deprived reasonable accommodations of his medically prescribed diet, ileostomy supplies, and other supplies including Detrol LA to help him control his over-active bladder. Further, Defendants Hulipas, Speer, and others have mocked and ridiculed Mr. Connors on several occasions when he was denied ileostomy supplies resulting in digestive waste leaking on him and emitting a foul odor.

> "Over the several years that I've been in TDCJ custody, I have been mocked and ridiculed by other inmates and prison staff, including prison guards and medical staff, including Defendants Hulipas and Speer in my related case, because of the leakage. This causes me to suffer depression and anxiety along with embarrassment and humiliation."[3]

Exhibit 5, at ¶ 21.

Being mocked by Defendants related to denial of ileostomy care and "leakage" is intentional discrimination in violation of the ADA and RA.

2.   MR. CONNORS WAS EXCLUDED FROM THE BENEFITS OF SERVICES, PROGRAMS, OR ACTIVITIES

Defendants argue, "there is no competent evidence that he was 'excluded from participation in or denied the benefits of services, programs, or activities' by UTMB or its employees." Motion, at 13.

---

[3] The related case Mr. Connors refers to in this affidavit is the instant case: 4:15-cv-1512.

The ADA does not require that a plaintiff was excluded from any benefits: "Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be denied the benefits of the services, programs, or activities of a public entity, *or be subject to discrimination by any such entity*" (emphasis added). 42 U.S.C. § 12132. It only requires that they suffer discrimination by a public entity by reason of their disability.

Nonetheless, Mr. Connors has explained that when he's on an improper diet or is denied appropriate ileostomy supplies, he suffers digestive waste leaking from his abdominal stoma or from his anus:

> "I feel humiliation and embarrassment each time I leak. The leakage is messy, emits a foul odor, I am not able to participate in life like other inmates because of the leakage. I don't go outside to exercise, for example, for fear of leakage and not being close to any place where I can clean myself. I generally avoid other activities available such as use of the library for the same reason. At this time, I do not believe that I can attend trial because over the course of one or a few hours, I will leak uncontrollably."

Exhibit 5, at ¶ 20.

Mr. Connors does not go outside to exercise or go to the library when he has been deprived supplies and has digestive waste on himself, or when he fears that due to inadequate supplies that he may leak on himself. When he leaks, it's uncontrollable, so a layperson would understand why Mr. Connors avoids the prisons benefits of the outside, library, etc., if he fears he might humiliate himself at any time, uncontrollably.


**G.     Defendants fail to address Other Claims of Mr. Connors**

The Corrected First Amended Complaint (Doc. No. 68) is the live pleading. Defendants' Motion is for summary judgment, but Defendants fail to partially address Cause of Action No. 1, namely deprivation of Detrol LA and a catheter for his bladder as well as acid reflux medication (FAC, ¶ 68), and the entirety of Cause of Action No. 3 Retaliation for Protected Speech (*id*., ¶¶

80–83). Defendants have not moved for summary judgment on those issues therefore their motion is properly characterized as a motion for partial summary judgment.

### H.     Defendant TDCJ is vicariously liable through ADA and RA

Plaintiff has given notice of dismissal for Defendant Bryan Collier (Doc. No. 96) that leaves only TDCJ as the prison defendant. The Court has not dismissed Collier pursuant to Fed.R.Civ.P. 41(a)(2). Defendant UTMB and its employees are contractors/subcontractors of Defendant TDCJ. Exhibit 1, 15:24–16:12.

The ADA and RA, each, hold public entities vicariously liable for the actions of their agents including contractors.

> "A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; […] (v) Aid or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program; […] (vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service."

28 CFR § 35.130(b)(1). *Plains Capital Bank v. Keller Independent School District*, 16-11802, (5th Cir. August 17, 2018) (citing *Delano-Pyle v. Victoria County Tex.*, 302 F.3d 567, 576–577. (5th Cir. 2002)).

Hence, TDCJ is vicariously liable for ADA and RA violations made by UTMB and its staff by discriminating against Mr. Connors on the basis of his disability, by failing to reasonably accommodate him, and denying him the benefits of the outside, library, et al.

### III.   <u>CONCLUSION</u>

For the reasons stated herein, Mr. Connors asks the Court to deny Defendants' Motions for Summary Judgment in their entirety.


Date: Dec. 6, 2019                          Respectfully submitted,

                                            */s/ Jerold D. Friedman*
                                            Jerold D. Friedman
                                            California SBN 290434
                                            SDTX Federal ID 2117436

                                            LAW OFFICE OF JEROLD D. FRIEDMAN
                                            19744 Beach Blvd. #390
                                            Huntington Beach, CA 92648
                                            (213) 536-1244
                                            fax (281) 667-3506
                                            lawoffice.jdf@gmail.com

                                            ***Attorney for Plaintiff***

## INDEX OF EXHIBITS

Exhibit 1: Oral Deposition of Ernestine Julye, M.D. (March 2019)

Exhibit 2: Oral Deposition of Ernestine Julye, M.D. (Sept. 2019)

Exhibit 3: Subpoena of Ernestine Julye, M.D.

Exhibit 4: Affidavit of Kevin Connors (May 2017)

Exhibit 5: Affidavit of Kevin Connors (July 2019)

Exhibit 6: Mr. Connors's Medical Records

Exhibit 7: Expert Report of Jerry W. Vlasak, M.D.

## <u>CERTIFICATE OF SERVICE</u>

    The undersigned counsel hereby certifies that he has electronically submitted a true and correct copy of the above and foregoing via the Court's electronic filing system on the 6th day of December 2019. Fed.R.Civ.P. 5(b).

*/s/ Jerold D. Friedman*

Jerold D. Friedman
