United States District Court
Southern District of Texas
**ENTERED**
February 07, 2020
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| **KEVIN CONNORS,** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CASE NO. 4:17-CV-1512** |
| | § | |
| **EDGAR HULIPAS, et al.** | § | |
| | § | |
| **Defendants.** | § | |

## O R D E R

Pending before the Court are the Plaintiff's Motion for Partial Summary Judgment **(Instrument No. 97)**, Defendant Texas Department of Criminal Justice's Motion for Summary Judgment **(Instrument No. 98)**, and Defendants University of Texas Medical Branch, Dr. Edgar Hulipas, and Terry Speer's Motion for Summary Judgment **(Instrument No. 100)**.

### I.

### A.

Plaintiff Kevin Connors ("Plaintiff" or "Connors"), a 51-year-old inmate at the Texas Department of Criminal Justice ("TDCJ"), brings civil rights and discrimination claims alleging inadequate and discriminatory medical treatment during his incarceration. (Instrument No. 28 at 1). Connors brings these claims against the TDCJ, the University of Texas Medical Branch ("UTMB"), and two UTMB health care providers, Dr. Edgar Hulipas ("Dr. Hulipas") and Terry Speer, R.N. ("R.N. Speer") in their individual capacities. *Id.* at 4-5.

Connors has been in custody of the TDCJ since 2005. (Instrument No. 97 at 6). During 2015 and 2016, Connors was housed in the Darrington Unit of TDCJ in Rosharon, Texas.

(Instrument No. 97-8 at 3). On June 8, 2017, Connors was transferred to the Estelle Regional Medical facility ("Estelle Unit") in Hunstville, Texas, where he is currently held. *Id.*

### 1.

In 2011, Connors was diagnosed with rectal cancer and underwent a proctocolectomy, a procedure that removes a portion of his colon and rectum. (Instruments No. 28 at 6; No. 97-4 at 4). As a consequence of the procedure, surgeons created a stoma, a dime-sized opening between his ileum—a portion of his small intestine—and the surface of his body. (Instrument No. 28 at 6). A diverting ileostomy bag was then fastened to Connors's lower-right abdomen and connected to the stoma to bypass the large intestine and expel his digestive waste. (Instruments No. 3-3 at 1; No. 97-4 at 4).

The ileostomy requires several medical supplies, including a wafer, which is an adhesive barrier that is placed on the abdomen. (Instrument No. 97 at 7). The wafer goes around the stoma and has an opening to which the ileostomy bag attaches, protecting the skin from the digestive waste. (Instrument No. 97-4 at 6). The ileostomy bag and wafers are recommended to be changed every 1-3 days, sometimes more often, to prevent leakage and infection. *Id.* This interval can be affected by hot climates, which can dissolve the wafer's adhesive and result in excess leakage. (Instruments No. 97-4 at 6; No. 97-8 at 2). Under those circumstances, it is recommended to change out the medical supplies more frequently. (Instrument No. 97-4 at 6).

Because the ileostomy bypasses the large intestine, the waste output is liquid. (Instrument No. 97-4 at 6). Due to this, a low-residue diet—a diet low in roughage—is typically prescribed for patients with an ileostomy to prevent an obstruction in the intestines. *Id.* at 6-7. Additionally, physicians typically prescribe hydration beverages (e.g., Pedialyte or Osmolyte) or diluted

electrolyte beverages (e.g., Gatorade) to provide nutrition and maintain consistency of the waste. *Id.* at 7.

Since the initial procedure, Connors has allegedly undergone twelve hospitalizations and five surgical operations due to rectal and stomal bleeding, or bowel obstruction. (Instrument No. 97-4 at 7). As a result of the surgery and these subsequent complications, Connors suffers from urinary incontinence and sexual dysfunction. *Id.* Due to Plaintiff's urinary incontinence, Plaintiff requires Detrol LA and a condom catheter to regulate and contain his excessive urination. (Instrument No. 3-3 at 3-4). Plaintiff has also testified to having acid reflux, which requires medical treatment. *Id.* at 4.

**2.**

**i.**

In April 2015 and January 2016, Plaintiff was seen by a UTMB Oncology Fellow who ordered for Plaintiff to receive a low-residue diet and a nutritional supplement three times daily. (Instruments No. 97-4 at 7; No. 100-1 at 12-13). The Oncology Fellow stated, "Please provide the patient with a low residue diet to prevent recurrent complications with rectal obstruction, which can likely result in another rectal infection and abscess formation . . . ." (Instrument No. 100-1 at 12). On May 5, 2015, Dr. Hulipas notes,

> Pt [patient] is overweight and on regular diet. Onc [Oncology] is recommending a low-residue diet, which means a diet that is low in fiber and easy to digest. It recommends avoiding whole gran foods, nuts, seeds, raw, or dried fruit, and vegetables. The prison diet can accommodate this as much of the starches are made of refined white flour, vegetable, are undercooked and mushy, with not much fiber in them and nuts and seeds are only sold in commissary.

(Instrument No. 100-3 at 3). Until August 2018, there was no change in the diet offered to Plaintiff and it was concluded that Plaintiff could receive the appropriate diet with medical advisement. (Instruments No. 100 at 6; No. 100-5 at 19-20). Around August 2018, Plaintiff

changed his diet request to a dialysis diet and has been on this diet since. (Instruments No. 87 at 12; No. 100-3 at 7; No. 108-2 at 13). During lockdowns, Plaintiff testified that he is made to eat non-low-residue food. (Instrument No. 3-3- at 2). Plaintiff testified that his colon has been blocked approximately twelve times because of the food provided at TDCJ. *Id.* As a result, Plaintiff stated that he sweats profusely, faces dizzy spells, and his abdomen swells and distends. *Id.* Other times, Plaintiff has blood, pus, or other fluids excreted from his anus, necessitating medical attention. *Id.*

## ii.

Since at least December 1, 2014, the nutritional supplement Osmolite has been prescribed to Plaintiff. (Instruments No. 97-4 at 7; No. 100-1 at 5; No. 100-3 at 3). On July 30, 2015, R.N. Speers allegedly advised nurses to stop giving Plaintiff his prescribed Osmolite. (Instrument No. 100-1 at 5). The next day, Plaintiff filed a grievance against R.N. Speer. *Id.* On October 15, 2015, a Darrington Unit official responded that a prescription for Osmolite was provided monthly from May 2015 to March 2016. *Id.* On October 16, 2015, Plaintiff appealed the decision made on his grievance. *Id.* at 4. On November 19, 2015, a response from the appeals division provided that there is no evidence to support his complaint that R.N. Speer instructed the pill window nurses not to administer Osmolite as prescribed. *Id.* The reviewer also noted that Plaintiff was not receiving his Osmolite three times a day, but that it was his responsibility to receive his supplement as ordered. *Id.*

Despite being prescribed his nutritional supplement on a routine basis, (Instruments No. 100-1 at 20, 21, 91; No. 100-3 at 3), the record shows that Osmolite was not routinely administered three times a day. For most months shown on the record, Osmolite was administered between 30-50 times. *See, e.g.*, (Instruments No. 100-1 at 24-25, 30-31, 32-33, 92-

94). For some months, the record shows that Plaintiff received Osmolite between 10-25 times. (Instruments No. 100-1 at 45-47, 51, 53). On February 21, 2017, an internal health services investigator found that Connors had not had a pass to go to the clinic three times daily for his osmolyte since July 10, 2014. (Instrument No. 100-1 at 96).

### iii.

From February to June 2015, Plaintiff was prescribed sixteen wafers each month. (Instrument No. 97-5 at 2-6). Plaintiff allegedly received the same number of wafers in July 2015.[1]   (Instrument No. 97 at 9). In July, because of the heat and lack of air conditioning, Plaintiff allegedly had to replace his wafers more often and exhausted his monthly supply of wafers before the end of the month. *Id.* Plaintiff made an informal complaint to a TDCJ staff who assisted Plaintiff in ordering additional wafers. *Id.* On July 27th, Plaintiff received ten additional wafers and other disposable medical supplies. (Instrument No. 97-5 at 7). The medical provider noted that "[d]ue to the heat he is going through the wafers and bags more often." *Id.* After this point, Plaintiff was prescribed twenty wafers each month. (Instrument No. 97 at 9).

On September 20, 2016, Plaintiff went to Medical Supply to request a new condom catheter. (Instrument No. 97 at 10). The Medical Supply Clerk refused to provide Plaintiff with the condom catheter and Plaintiff argued that he would file a grievance against her. (Instrument No. 97-8 at 3 ¶ 11). The Clerk retrieved R.N. Speers who allegedly stated that if Plaintiff threated to write a grievance, then Plaintiff's supplies would be reduced. *Id.* Plaintiff then continued to use his old condom catheter. (Instrument No. 97 at 10).

On September 21, 2016, an order for Plaintiff's regular monthly supply was ordered. (Instrument No. 97-6 at 3). On September 22, 2016, without examining Plaintiff, Dr. Hulipas

---

[1] The record does not include a physician's initial prescription of wafers for July 2015. The record only includes the additional order of wafers on July 27, 2015. (Instrument No. 97-5).

reduced Plaintiff's monthly supply order effective for the next twelve months. (Instruments No. 97 at 10; No. 97-6 at 4). The monthly supplies were reduced as follows:

1.  20 wafers reduced to 9 wafers;
2.  20 ileostomy bags reduced to 9 bags;
3.  20 trash bags reduced to 10 bags;
4.  16 skin preps reduced to 9 skin preps; and
5.  400 gauze pads reduced to 10 pads

(Instrument No. 97 at 10). Dr. Hulipas, R.N. Speers, and the Medical Supply Clerk refused to change the order. *Id.* at 11. During this time, Plaintiff testified that he has to use toilet paper instead of gauze to clean his stoma. (Instrument No. 3-3 at 3). Plaintiff stated that when he did not have the adequate supplies, he suffered from "physical discomfort, rancid smells, and soiled clothes due to the leaked digestive waste." (Instrument No. 97-8 at 4). Plaintiff further stated that during this time he endured humiliation from other inmates and avoided going to the chapel, commissary, and chow hall for fear of ridicule. *Id.*

On September 26, 2016, Plaintiff filed a grievance against Dr. Hulipas, requesting to be seen by a medical facility that can amend the ileostomy supplies he required. (Instrument No. 100-1 at 58). On December 25, 2016, the responding unit official stated, "You were seen and evaluated for your symptoms by medical. Treatment and medication decisions are the purview of the licensed medical provider and are not based on patient request. No further action required. If you have any other medical needs, please submit a sick call request." *Id.* at 58. On January 1, 2017, the reviewer noted that a statement was provided by Dr. Hulipas explaining that a "reasonable amount of supplies (of each item were taken into consideration)." *Id.* at 62. Plaintiff was instructed to visit the infirmary if he needed additional items. *Id.*

On October 25, 2016, a UTMB physician's assistant reversed Dr. Hulipas's order and ordered Plaintiff to have:

1. 20 wafers
2. 20 ileostomy bags
3. 20 trash bags
4. 20 skin preps
5. 50 gauze pads

(Instrument No. 97-6 at 6). On November 9, 2016, a UTMB physician ordered the Darrington Unit to "have all supplies available to patient as needed." *Id.* at 7 (emphasis omitted).

On at least three occasions, physicians have recommended for Plaintiff to undergo an ileostomy reversal procedure. (Instruments No. 105-2 at 8; No. 100-4 at 6). On all occasions, Plaintiff refused and has expressed a fear of a bad outcome as a result of the procedure. (Instrument No. 100-4 at 6).

## B.

On May 16, 2017, Plaintiff filed his Complaint. (Instrument No. 1). On September 8, 2017, Defendants Dr. Halupis, R.N. Speer, and UTMB filed their Answer. (Instrument No. 21). On November 6, 2017, Plaintiff filed his First Amended Complaint. (Instrument No. 28). Plaintiff brings claims against (1) TDCJ and UTMB for violation of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("RA"), (2) all defendants for failure to provide medical care under § 1983 in violation of the Eighth Amendment, and (3) Dr. Hulipas and R.N. Speers for retaliation under § 1983 in violation of the First Amendment. (Instrument No. 28).

On October 30, 2019, Plaintiff filed his Motion for Partial Summary Judgment. (Instrument No. 97). On November 1, 2019, TDCJ filed its Motion for Summary Judgment. (Instrument No. 98). On the same day, Dr. Halupis, R.N. Speer, and UTMB filed their Motion for Summary Judgment. (Instrument No. 100).

On December 3, 2019, Dr. Halupis, R.N. Speer, and UTMB filed their Response to Plaintiff's Motion for Partial Summary Judgment. (Instrument No. 105). Two days later, on December 5, 2019, TDCJ filed its Response to Plaintiff's Motion. (Instrument No. 107). On December 6, 2019, Plaintiff filed a Consolidated Response in Opposition to Defendants' Motions for Summary Judgment. (Instrument No. 108). On December 26, 2019, Plaintiff filed his Consolidated Reply to Defendants' Responses. (Instrument No. 109).

## II.

As a preliminary matter, in his Response, Plaintiff raises objections to summary judgment evidence introduced by Defendants UTMB, Dr. Hulipas, and R.N. Speer (collectively "Medical Defendants"). (Instrument No. 108 at 8-11). The Medical Defendants designated Dr. Ernestine Julye as their non-retained testifying expert witness. (Instrument No. 47). Plaintiff raises issues under Rule 702 of the Federal Rules of Evidence and 45(e) under the Federal Rules of Civil Procedure, arguing, respectively, that the expert opinion is based on insufficient data and Dr. Julye was noncompliant with a subpoena. (Instrument No. 108 at 9-10).

On a motion for summary judgment, "the admissibility of evidence . . . is subject to the usual rules relating to form and admissibility of evidence." *Munoz v. Int'l Alliance of Theatrical Stage Emps. & Moving Picture Mach. Operators of U.S. & Can.*, 563 F.2d 205, 213 (5th Cir. 1977). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The hearsay rules as prescribed by Federal Rules of Evidence 801 and 802 apply with equal force in the summary judgment context. *Warfield v. Byron*, 436 F.3d 551, 559 (5th Cir. 2006). Furthermore, conclusory statements, unsubstantiated and subjective beliefs, and speculative statements are not

proper summary judgment evidence. *See Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

As the Court's analysis will show, the Court did not need to rely upon the expert opinion objected to by Plaintiff. Any evidence in the Court's analysis sourced from Dr. Julye's affidavit or deposition is either duplicative of other evidence properly received and considered, or is evidence that Plaintiff cites to in his own arguments. *See, e.g.*, (Instruments No. 97 at 7, 13-15; No. 108 at 16). Nonetheless, the Court's consideration of the Medical Defendants' expert opinion was unnecessary to the resolution of these motions. *See Floyd v. Hefner*, 556 F. Supp. 2d 617, 636 (S.D. Tex.   2008) (Harmon, J.) (overruling objections to evidence which was duplicative of other evidence in the summary judgment record); *Brantley v. Inspectorate Am. Corp.*, 821 F. Supp. 2d 879, 886 (S.D. Tex. 2011) (Gilmore, J.).

Accordingly, Plaintiff's objections are OVERRULED.

## III.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006); *see also* Fed. R. Civ. P. 56(a).

The "movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex*, 477 U.S. at 322-25). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the

non-moving party." *Fisk Elec. Co. v. DQSI, L.L.C.*, 894 F.3d 645, 650 (5th Cir. 2018) (internal quotations omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "showing — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

After the moving party has met its burden, in order to "avoid a summary judgment, the nonmoving party must adduce admissible evidence which creates a fact issue concerning the existence of every essential component of that party's case." *Thomas v. Price*, 975 F.2d 231, 235 (5th Cir. 1992). The party opposing summary judgment cannot merely rely on the contentions contained in the pleadings. *Little*, 37 F.3d at 1075. Rather, the "party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 457, 458 (5th Cir. 1998); *see also Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). Although the court draws all reasonable inferences in the light most favorable to the nonmoving party, *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008), the nonmovant's "burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux*, 402 F.3d at 540

(quoting *Little*, 37 F.3d at 1075). Similarly, "unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment." *Clark v. Am.'s Favorite Chicken*, 110 F.3d 295, 297 (5th Cir. 1997).

In deciding a summary judgment motion, the district court does not make credibility determinations or weigh evidence. *E.E.O.C. v. Chevron Phillips Chem.Co.*, *LP*, 570 F.3d 606, 612 n.3 (5th Cir. 2009). Nor does the court "sift through the record in search of evidence to support a party's opposition to summary judgment." *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 379-80 (5th Cir. 2010); *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003); *Ragas*, 136 F.3d at 458; *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir.1988) (it is not necessary "that the entire record in the case ... be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered"). Therefore, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara*, 353 F.3d at 405.

## IV.

Plaintiff moves for partial summary judgment on his Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA") claims against UTMB and TDCJ. (Instrument No. 97 at 5). In particular, Plaintiff moves for partial summary judgment on these claims as it relates to his ileostomy supplies. *Id.* at 19.

TDCJ moves for summary judgment on three grounds: (1) Plaintiff failed to exhaust his administrative remedies as they relate to TDCJ, (2) Plaintiff's claims against TDCJ are moot, and (3) TDCJ violated neither the ADA nor RA. (Instrument No. 98 at 4-9).

Lastly, UTMB, Dr. Hulipas, and R.N. Speers move for summary judgment on both the ADA and RA claims, and the § 1983 claim. (Instrument No. 100 at 3, 11, 13). Additionally, they assert an affirmative defense of qualified immunity for Dr. Hulipas and R.N. Speers, and Eleventh Amendment for UTMB. *Id.* at 9, 14-15.

### A.

Plaintiff brings ADA, RA, and § 1983 claims against both TDCJ and UTMB for failure to provide adequate medical care. (Instrument No. 28 at 18). However, TDCJ and UTMB are state agencies, allowing for immunity under the Eleventh Amendment. Tex. Educ. Code § 65.01 *et seq.*; Tex. Gov't Code § 493.001 *et seq.* Because the Eleventh Amendment protects the state's sovereign immunity, federal courts lack jurisdiction over suits against a state or state agency for money damages unless the state has waived the immunity or Congress clearly abrogated that immunity. *NiGen Biotech, L.L.C., v. Paxton*, 804 F.3d 389, 393-94 (5th Cir. 2015); *Moore v. La. Bd. of Elem. and Secondary Educ.*, 743 F.3d 959, 963 (5th Cir. 2014).

"The Eleventh Amendment bars suit against state entities such as TDCJ and UTMB regardless of whether money damages or injunctive relief is sought under § 1983." *See Flaming v. University of Texas Medical Branch*, No. H-15-2222, 2016 WL 727941, *5 (S.D. Tex. Feb. 24, 2016) (Atlas, J.) (citing *Aguilar v. Texas Dept. of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1988) (TDCJ) and *Clay v. Texas Women's Univ.*, 728 F.2d 714, 715-16 (5th Cir. 1984) (holding state agencies such as universities immune from § 1983 suits)). Thus, Plaintiff's § 1983 claims for money damages against TDCJ and UTMB are barred.

However, recovery of damages may be permitted under the RA and ADA. First, the Fifth Circuit has held that a state implicitly waives immunity from suit under § 504 of the RA for any activity for which it accepts federal funds. *Hurst v. Texas Dep't of Assistive & Rehab. Servs.*, 482

F.3d 809, 810-14 (5th Cir. 2007). Plaintiff asserts that TDCJ and UTMB, as state agencies, accept federal funds, (Instrument No. 97 at 20), and neither defendant refutes this. Thus, both state agencies have implicitly waived immunity from claims brought under § 504 of the RA.

Second, Title II of the ADA permits the recovery of damages from a state or state actor for conduct that violates the Fourteenth Amendment. *See United States v. Georgia*, 546 U.S. 151, 159 (2006); *Hale v. King*, 642 F.3d 492, 497-98 (5th Cir. 2011). Therefore, Plaintiff may still recover damages under the ADA if he shows that the conduct that violates the ADA also rises to the level of a constitutional violation. *Id.* The Court must then first determine whether Plaintiff successfully makes this showing before the Court can permit recovery of compensatory damages from TDCJ and UTMB under the ADA.

Accordingly, Plaintiff's § 1983 claims against TDCJ and UTMB are DISMISSED. The Court will discuss the ADA/RA claims as it relates to TDCJ under Section III.B. The Court will then discuss these claims as it relates to UTMB in Section III.C.

## B.

In its Motion for Summary Judgment, TDCJ argues that Plaintiff failed to exhaust his administrative remedies before bringing a suit against TDCJ. (Instrument No. 98 at 6). Plaintiff does not address this issue in his Response to TDCJ's Motion. *See* (Instrument No. 108).

Title 42 U.S.C. § 1997e provides that:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a) (2013).

Exhaustion is a prerequisite to a suit even when the prisoner seeks relief not available in grievance proceedings, such as money damages. *See Booth v. Churner,* 532 U.S. 731, 740–41

(2001). Prisoners exhaust their administrative remedies when they complete the grievance process in a manner "sufficiently specific to give officials a fair opportunity to address the problem that will later form the basis of the lawsuit." *Petzold v. Rostollan*, No. 17-41183, 2019 WL 7206050, at *8 (5th Cir. Dec. 27, 2019). When a prisoner fails to exhaust his administrative remedies before filing suit without a valid excuse, the court may dismiss the action without prejudice to its refiling after the prisoner exhausts his administrative remedies. *See Wendell v. Asher,* 162F.3d 887, 890–92 (5th Cir.1998); *Gordon v. Pettiford,* 271 F. App'x 464, 464 (5th Cir.2008) (per curiam).

The TDCJ currently provides a two-step procedure for presenting administrative grievances. Step 1 requires the prisoner to submit an administrative grievance at his unit within fifteen days of the relevant incident. *Wendell v. Asher,* 162 F.3d 887, 892 (5th Cir. 1998). The inmate then receives a response from the unit official following an investigation. *Johnson v. Johnson*, 385 F.3d 503, 515 (5th Cir. 2004). If unsatisfied with the decision, the inmate has fifteen days to appeal the decision by filing a Step 2 grievance, which is handled at the state level. *Id.* Both steps must be completed in order to file suit in federal court. *Id.*

Exhaustion is an affirmative defense. *Cowart v. Erwin*, 837 F.3d 444, 451 (5th Cir. 2016). As such, defendants have the burden to demonstrate that plaintiffs failed to exhaust available administrative remedies. *Id.* The inquiry of whether the administrative remedies have been exhausted is a mixed question of law and fact. *Dillon v. Rogers*, 596 F.3d 260, 268 (5th Cir. 2010).

Since 2015, Connors has filed at least five grievance proceedings. (Instruments No. 98-4 at 36, 87; No. 100-1 at 3, 37, 41, 55). Of the grievance proceedings relevant to this suit, none have been filed against TDCJ or a TDCJ official. Given that the purpose of the exhaustion

requirement is to give officials "time and opportunity to address complaints internally," *Johnson*, 385 F.3d at 517 (citations omitted), Plaintiff did not exhaust its administrative remedies as it relates to any issues with TDCJ or its officials. Furthermore, since Plaintiff did not provide a response to TDCJ's affirmative response, the Court may consider the fact undisputed for purposes of the Motion. *See* Fed. R. Civ. P. 56(e).

Accordingly, Defendant TDCJ's Motion for Summary Judgment is GRANTED.

## C.

Plaintiff moves for summary judgment on the basis that UTMB's failure to provide Plaintiff with his ileostomy supplies amounts to a refusal to accommodate his disabilities in violation of the ADA, 42 U.S.C. § 12132, and the RA, 29 U.S.C. § 794. (Instrument No. 97 at 19). Defendant UTMB moves for summary judgment on the ADA and RA claims in their entirety. (Instrument No. 100 at 11).

The ADA and RA use the same legal standards and make available the same legal remedies. *See Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010) (using the ADA standard to determine both ADA and RA claims). Because the jurisprudence interpreting either section is applicable to both, the Court will analyze both claims together. *See Cadena v. El Paso County*, No. 18-50765, 2020 WL 39019, at *3 (5th Cir. Jan. 3, 2020); *Delano-Pyle v. Victoria County*, 302 F.3d 567, 574 (5th Cir. 2002).

The ADA and RA impose upon public entities an obligation to make reasonable accommodations or modifications for persons with disabilities, including in prisoners. *Garrett v. Thaler*, 560 Fed. App'x 375, 382 (5th Cir. 2014) (citing *Tennessee v. Lane*, 541 U.S. 509, 531 (2004)); *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005). To establish a valid claim under Title II of the ADA or RA, a plaintiff must show that (1) he is a qualified

individual, (2) who was excluded from participation in or denied the benefits of services, programs, or activities of a public entity, or is otherwise discriminated against by the public entity, and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. *See Cadena*, 2020 WL 39019, at *3; *Lightbourn v. County of El Paso*, 118 F.3d 421, 428 (5th Cir. 1997).

Under both statutes, discrimination effectively means failure to provide a reasonable accommodation to the needs of a disabled person as it relates to their disability. *See Tennessee v. Lane*, 541 U.S. 509, 531 (2004); *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir. 2004). The failure to take reasonable measures to provide accommodations or modifications may constitute a denial of services and discrimination sufficient to satisfy the latter two prongs of the Title II inquiry. *Garrett*, 560 Fed. App'x at 382. Moreover, "failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners." *United States v. Georgia*, 546 U.S. at 160.

To recover compensatory damages under the ADA or RA, intentional discrimination is required. *Delano-Pyle*, 302 F.3d at 574. While the Fifth Circuit has not defined "intentional discrimination" in detail, the Court has noted that the concept requires "something more than deliberate indifference," and includes actions manifesting discriminatory animus. *Cadena*, 2020 WL 39019, at *3; *Shaikh v. Texas A&M Univ. Coll. Of Med.*, 739 Fed. App'x 215, 223 n.9 (5th Cir. 2018).

Assuming *arguendo* that Plaintiff meets the first and second prong, Plaintiff fails to establish the third prong. Plaintiff argues that the deprivation and reduction of his supplies demonstrated that he was being discriminated against on the basis of his disability, but there is

no evidence on the record that suggests these acts were committed because Plaintiff was disabled. *See* (Instrument No. 97 at 23-25). To the contrary, the record shows that Plaintiff has been provided medical supplies each month. *See, e.g.*, (Instruments No. 97-5 at 7; No. 97-6 at 3). Furthermore, any disagreement between UTMB staff and Plaintiff on how to provide Plaintiff his low-residue diet is not an indication that there was discrimination because Plaintiff is disabled. The ADA is not violated by "a prison's simply failing to attend to the medical needs of its disabled prisoners." *Nottingham v. Richardson*, 499 Fed. App'x 368, 377 (5th Cir. 2012). Thus, Plaintiff does not meet the third prong of the Title II inquiry.

Plaintiff's Response to Defendant UTMB's Motion for Summary Judgment points out that UTMB fails to address Plaintiff's other ADA and RA claims involving the deprivation of a bladder relaxant medication, long catheter tube, and acid reflux medication. (Instrument No. 108 at 32). However, those claims would face the same problem under the third prong of the Title II inquiry.

Because Plaintiff fails make a valid claim under Title II, the Court finds it unnecessary to determine whether Plaintiff has met the additional burdens required to recover compensatory damages under the ADA.

Accordingly, Plaintiff's Motion for Partial Summary Judgment is DENIED and Defendant UTMB's Motion for Summary Judgment is GRANTED.

### D.

Defendants Dr. Hulipas and R.N. Speer (collectively "Defendants") move for summary judgment on the § 1983 deliberate indifference claim. (Instrument No. 100 at 3). Defendants specifically argue that they are entitled to a judgment as a matter of law on the issues of the low-

residue diet, provision of the nutritional supplement, and provision of ileostomy supplies. *Id.* at 6-7.

Prisoners are protected from cruel and unusual punishment by the Eighth Amendment. U.S. Const. amend. VIII. An Eighth Amendment violation occurs when a prison official is deliberately indifferent to an inmate's health and safety such that it creates a deprivation of "the minimal civilized measure of life's necessities." *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).

The deliberate indifference standard has an objective and subjective prong. *See Farmer*, 511 U.S. at 834. First, the deprivation alleged must be an objective exposure to "a sufficiently substantial risk of serious damage to his future health." *Id.*; *Gobert v. Caldwell*, 463 F.3d 339, 349 (5th Cir. 2006). Second, under the subjective prong, the prisoner must show that an official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. In other words, Plaintiff must show that Defendants were both (1) aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn, and (2) actually drew an inference that such potential for harm existed. *See Farmer*, 511 U.S. at 837; *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999).

Deliberate indifference is more than mere negligence. *Farmer*, 511 U.S. at 835. In the context of medical treatment, a prisoner must show that prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Gobert*, 463 F.3d at 346 (internal quotation marks and citations omitted). It is well established that "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional

circumstances." *Gobert*, 463 F.3d at 346 (citing *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995). Deliberate indifference can be exhibited when a prisoner is denied prescribed treatment or access to medical personnel capable of treating the prisoner. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). Even a delay in medical care can constitute an Eighth Amendment violation if there was deliberate indifference that resulted in substantial harm. *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006) (emphasis omitted). "Medical records of sick calls, examinations, diagnosis, and medications may rebut an inmate's allegations of deliberate indifference." *Id.* (citing *Mendoza v. Lynaugh*, 989 F.2d 191, 193-95 (5th Cir. 1993)).

### i.

Defendants argue that they were not deliberately indifferent to Plaintiff's need for a low-residue diet because Plaintiff actually received this diet under the guidance of Defendants. (Instrument No. 100 at 6). Plaintiff argues that there is an issue of material fact as to whether Plaintiff is actually receiving a low-residue diet and is being properly counseled on what to eat from the standard prison menu. (Instrument No. 108 at 16). Plaintiff further asserts that picking through the standard prison food, as advised by Defendants, has been ineffective to treat Plaintiff, resulting in bowel obstructions. *Id.* at 23-24.

While there may be disputed facts, there is no dispute of a material fact. Defendants proffered evidence that they were aware of the Oncology Fellow's recommendation for a low-residue diet, that they assessed what it meant in practice (a diet low in fiber, avoiding items such as whole grains, nuts, seeds, or dried fruit/vegetables), and how they could accommodate Plaintiff's need given the available options at TDCJ. *See, e.g.*, (Instrument No. 100-3 at 3). The record indicates that, at some point, Plaintiff was switched to a dialysis diet to reduce his fiber consumption. (Instruments No. 87 at 12; No. 87-2). Plaintiff even shows that the facility staff

attempted to accommodate Plaintiff's needs by offering a pureed diet in addition to selecting low-residue food items from the standard prison diet. (Instrument No. 108-6 at 3). While the approach of picking around the standard prison menu may be ineffective, unsuccessful medical treatments and differences in medical opinion do not constitute deliberate indifference. *See Gobert*, 463 F.3d at 346; *Banuelos*, 41 F.3d at 235. Plaintiff provides evidence that a low-residue diet has been prescribed to Plaintiff on multiple occasions to reduce the risk of bowel obstructions and complications, however he fails to demonstrate that Defendants evinced a wanton disregard for this medical treatment. *See* (Instruments 108 at 21-23; No. 108-2 at 18 [158:21—25]). UTMB staff within the TDCJ unit is best equipped to determine how to effectuate specialist recommendations, and the Court is not positioned to disagree with medical opinions.

Because Defendants provide evidence suggesting that they were aware of Plaintiff's need for a low-residue diet and did not disregard that need, and Plaintiff does not point to an issue of material fact, Defendants were not deliberately indifferent to Plaintiff's need for a low-residue diet.

### ii.

Defendants argue that they were not deliberately indifferent to Plaintiff's need for a nutritional supplement and, in contrast, they consistently issued and renewed Plaintiff's prescription for Osmolite. (Instrument No. 100 at 8). As Plaintiff points out, the record indicates that Plaintiff was not receiving his Osmolite supplement consistently three times a day since 2014. (Instrument No. 100-1 at 24-34, 45-53, 92-94). However, a showing of inconsistency amounts to no more than a showing of negligence, falling short of deliberate indifference. *See Farmer*, 511 U.S. at 835. While there may be a substantial risk of serious harm if Plaintiff does

not receive his nutritional supplements, Plaintiff fails to point to evidence in the record demonstrating that Defendants were aware of the facts from which an inference of excessive risk of health could be drawn and actually drew that inference. Plaintiff points to his own affidavit where he asserts that Defendants were ordered by medical specialists to prescribe a regular supply of Osmolite, but the record supports a finding that Defendants regularly prescribed Plaintiff the supplement. *See, e.g.*, (Instruments No. 108 at 28; No. 97-4 at 7; No. 100-1 at 91). Thus, Plaintiff failed to meet his burden of showing that there is a genuine question of fact as to Defendants deliberate indifference when prescribing Osmolite.

### iii.

Lastly, Defendants argue that there is an absence of an issue of material fact as to whether Defendants were deliberately indifferent to Plaintiff's need of ileostomy supplies. (Instrument No. 100 at 7).

Turning to the objective prong first, the record supports a finding that the alleged deprivation of medical supplies created a sufficiently serious risk to Plaintiff's health. *See, e.g.*, (Instrument No. 97-8). The Fifth Circuit has held that an open wound, alone, can pose a substantial health risk to a prisoner. *Gobert*, 463 F.3d 339, 349 (5th Cir. 2006). Similarly, a stoma is an opening on Plaintiff's body that exposes his organ to the external environment, making it susceptible to infection when not cleaned and protected. *See* (Instrument No. 97-4 at 6). Moreover, Plaintiff testified that when he is unable to replace his wafers and ileostomy bags as required, Plaintiff risks digestive waste seeping onto his body, which can also result in infection. (Instrument No. 97-8 at 4). The alleged deprivation of the ability to prevent one's digestive waste from seeping onto one's body can only be classified as cruel and inhuman under any standard of human decency and amounts to a deprivation of a "minimal civilized measure of

life's necessities." *See Wilson*, 501 U.S. at 298; *Hudson v. Palmer*, 468 U.S. 517, 537 (1984) (O'Connor, J., concurring) (considering human decency when determining the violation of a prisoner's constitutional right); *Rhodes v. Chapman*, 452 U.S. 337, 346-47 (1981) (measuring forbidden "cruel and unusual punishments" by society's "evolving standards of decency"). Thus, the objective prong has been met.

Next, while the record shows that Defendants were aware of the risk posed to Plaintiff by being provided fewer ileostomy supplies, there is an issue of material fact as to whether Defendants disregarded the excessive risk to Plaintiff's health or, in other words, that the actual inference was drawn. First, the record shows that Defendants were aware that fewer medical supplies would result in Plaintiff leaking digestive waste on himself. Plaintiff testifies that medical staff increased Plaintiff's supplies during the summer when Plaintiff quickly exhausted his supply due to the heat. (Instruments No. 97 at 9; No. 97-5 at 7). Additionally, Plaintiff testifies that medical staff, including Defendants, have witnessed Plaintiff leaking on himself due to inadequate medical supplies. (Instruments No. 3-3 at 2; No. 97-8 at 4; No. 108-5 at 7 ¶ 21). Thus, the record supports a finding that Defendants were aware of the risk posed to Plaintiff if he had fewer medical supplies.

Second, the record demonstrates that there is an issue of material fact as to whether Defendants disregarded the excessive risk to Plaintiff's health. Defendants point to evidence that they offered Plaintiff an ileostomy reversal procedure, which Plaintiff has refused, and that Plaintiff was only short on his supplies because he failed to either pick them up or submit a sick call to request additional supplies. (Instrument No. 100 at 7). In contrast, Plaintiff points to evidence showing that on September 20, 2016, R.N. Speer stated that Plaintiff's supplies would be reduced if Plaintiff threatened to write a grievance about not receiving a new condom

catheter. (Instrument No. 97-8 at 3). Shortly thereafter, Dr. Hulipas ordered Plaintiff's medical supplies to be cut by more than half. *Id.*; (Instrument No. 97 at 10). The record provides a note from Dr. Hulipas to TDCJ staff confirming that the supplies were reasonable. (Instrument No. 100-1 at 62). However, Plaintiff proffers additional evidence that Dr. Hulipas did not reduce the supplies as a result of examining Plaintiff and that Defendants refused to change the order when requested. (Instrument No. 97-8 at 3). Additionally, Plaintiff shows that one month later a UTMB physician's assistant reversed Dr. Hulipas's order and restored Plaintiff's medical supply. (Instrument No. 97-6 at 6).

Accordingly, Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part as follows: GRANTED as to Plaintiff's deliberate indifference claims regarding the low-residue diet and nutritional supplement and DENIED as to Plaintiff's deliberate indifference claim regarding his medical supplies.

### E.

Plaintiff is suing Defendants Dr. Hulipas and R.N. Speer in their individual capacities. (Instrument No. 28 at 4). Defendants argue that they are entitled to qualified immunity as to the deliberate indifference claim. (Instrument No. 100 at 9). Since the first two deliberate indifference claims related to the low-residue diet and nutritional supplements have been dismissed, the Court will only discuss the qualified immunity defense as it relates to Plaintiff's need for medical supplies.

Qualified immunity is an affirmative defense that shields government officials from liability "when their actions could reasonably have been believed to be legal." *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011). The defense is available to government officials who perform discretionary functions "insofar as their conduct does not violate clearly established

rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

The plaintiff bears the burden of negating qualified immunity once it has been properly raised by the defendant. *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009). The plaintiff must show that the defendant committed an unreasonable violation of a clearly established law or demonstrate that there is an issue of fact for the fact finder on this issue. *Thompson v. Mercer*, 762 F.3d 433, 437, 441 (5th Cir. 2014); *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005). The plaintiff cannot rest on conclusory allegations and assertions, but rather must demonstrate genuine issues of material fact regarding the reasonableness of the official conduct. *Id.*

Courts apply a two-prong test to determine whether a plaintiff has met this burden: (1) whether a constitutional right would have been violated on the facts alleged, and (2) whether the right at issue was "clearly established" at the time of the misconduct, rendering the conduct objectively unreasonable. *Saucier v. Katz*, 533 U.S. 193, 201 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009). Courts are permitted to exercise their sound discretion in determining which of the two prongs to address first. *Pearson*, 555 U.S. at 236.

As stated earlier, the record reflects a material fact issue as to whether Defendants were deliberately indifferent to Plaintiff's need of medical supplies, which would amount to an Eighth Amendment violation under the first prong of qualified immunity. Resolving this material fact issue is pertinent to determining the second prong of the inquiry, namely whether Defendants' actions were objectively unreasonable. Thus, there remains an issue of material fact as to whether Defendants are entitled to qualified immunity.

Accordingly, Defendant's Motion for Summary Judgment on the issue of qualified immunity is DENIED.

## V.

For the foregoing reasons, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Partial Summary Judgment is **DENIED**. **(Instrument No. 97).**

**IT IS FURTHER ORDERED** that Defendant TDCJ's Motion for Summary Judgment is **GRANTED** and Plaintiff's claims against TDCJ are **DISMISSED**. **(Instrument No. 98)**.

**IT IS FURTHER ORDERED** that Defendants UTMB, Dr. Hulipas, and R.N. Speer's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**. **(Instrument No. 100)**. All claims against UTMB are **DISMISSED**. All claims against Dr. Hulipas and R.N. Speers are **RETAINED**.

The Clerk shall enter this Order and provide a copy to all parties.

SIGNED on this _____ day of February, 2020.

**VANESSA D. GILMORE**
**UNITED STATES DISTRICT JUDGE**